2008 VT 119

**STATE of Vermont v. Norman HARDY, Jr.**

[965 A.2d 478]

No. 08-301

¶ 1. August 6, 2008. Defendant appeals from an order of the district court, denying him bail. On appeal, defendant argues that the trial court erred in citing Battered Women's Syndrome (BWS) in its written decision and in relying on syndrome evidence in finding that the evidence of guilt was great.

¶ 2. On June 22, 2008, several members of the Brattleboro Police Department responded to a disturbance report at defendant's address. One of the officers was familiar with defendant and the complainant, A.M., because of past domestic-assault calls made by A.M. to the Brattleboro police. A.M. and defendant had been dating for several years, lived together, and shared the care of their one-year-old son. When the officers first encountered A.M. on June 22, they noticed that her face was red and that she had a "slight reddening around the side of her neck."

¶ 3. Police officers took A.M.'s statement, in which she disclosed the following. Early the morning of June 22, A.M. reported, defendant woke her up and demanded her car keys, cell phone, and money. Defendant told her that he needed the items before leaving the home. When A.M. refused to turn over the items, defendant grabbed her throat from behind with one of his hands, and forced her face onto the bed. Defendant then placed his other hand over A.M.'s nose and mouth and applied pressure so that she could not breathe. A.M. stated that defendant had strangled her for about thirty seconds, triggering a severe asthma attack.

¶ 4. When defendant released her, A.M. ran to the upstairs bathroom and locked the door. After defendant kicked open the door, he grabbed A.M. by the throat again, one hand around the front of her neck and the other around the back, again preventing A.M. from breathing. When defendant released A.M., he tried to tear down a shower curtain and smashed a mirror hanging in the bathroom. Defendant then struck A.M. in the face, forcing her to the floor. At this point, A.M. tried to escape by climbing out the bathroom window. Defendant pulled her back in by the hair and strangled her a final time.

¶ 5. One responding officer, Detective Carignan, noticed what he had been taught were signs of strangulation. A.M.'s voice was unusually hoarse, and she had scrapes and marks on her body, a red and irritated neck, and the beginnings of bruising on her throat. Detective Carignan also observed that there appeared to be broken capillaries in A.M.'s eyes, another typical sign of strangulation. Defendant also spoke with Detective Carignan at the scene. Admitting that it was "possible" that he made contact with A.M.'s throat in lowering her to the floor, defendant claimed that he had been trying only to defend himself against A.M. At this time, A.M. also turned a diary over to Detective Carignan. In the diary, A.M. documented an assault that had taken place on June 4, 2008, in which defendant strangled A.M. in the street, caused her to vomit, and impeded her breathing. A.M. told Detective Carignan that defendant had destroyed a previous diary in which she had described other occasions of abuse.

¶ 6. On June 23, 2008, based on the June 22 incident, defendant was arraigned on charges of first-degree domestic assault, charged as a habitual offender, and held without bail. If found to be a habitual offender, defendant can be sentenced to life in prison. 13 V.S.A. § 11. Pursuant to 13 V.S.A. § 7553, the court set

a weight-of-the-evidence hearing for July 3, 2008. At this hearing, the State offered the testimony of A.M. A.M. offered a somewhat different version of events than the one recounted in the sworn statement taken by Detective Carignan. A.M. explained that she had been trying to prevent defendant from leaving the apartment when defendant "tried to restrain [her] in a sense." A.M. denied having had a previous diary and attributed her difficulty breathing to asthma anxiety attacks that she suffered when she was "worked up." A.M. also claimed that she had destroyed the bathroom mirror. Detective Carignan testified about his observations of A.M., defendant, and their home following the June 22 incident. The court also admitted a DVD of a sworn statement given by A.M. on the day of the alleged assault.

¶ 7. On July 10, 2008, the court issued written findings of fact, conclusions of law, and an entry order regarding defendant's bail status. Finding A.M.'s testimony to be "inconsistent and highly confusing," the court noted several inculpatory aspects of A.M.'s testimony, including: (1) A.M.'s admission that defendant had his arm around her jaw; (2) A.M.'s acknowledgment that she had been climbing out the window and was afraid that defendant might harm her; (3) A.M.'s confirmation that defendant's encounters with her had become more violent and frequent; and (4) A.M.'s testimony that it "felt like" defendant was choking her "at the time." The court found A.M.'s initial statement to police to be more credible in part because A.M.'s physical condition corroborated her initial story, as did the state of the scene.

¶ 8. In its conclusions of law, the court noted that "[i]t is not unusual for a victim of repeated domestic violence to minimize, explain away, or fully recant allegations of abuse." After citing several of this Court's decisions on the admissibility of Battered Women's Syndrome evidence, the court found the present case to be one of the instances in which "a victim of domestic violence . . . chooses to remain in an abusive relationship and [to] assist her attacker in legal proceedings." For these reasons, the court found that it would be "doubtful" that a jury would believe A.M.'s later account of the June 22 incident. In finding that the evidence of guilt was great, the court also noted that defendant posed a continued risk to A.M., had violated his parole, had violated his probation, had been convicted of escape, and had failed to appear for court proceedings on six prior occasions.

¶ 9. On appeal, defendant makes two arguments. First, defendant contends that the court erred in taking judicial notice of Battered Women's Syndrome and in diagnosing A.M. with the syndrome. Second, defendant claims that the court erred in denying his motion to dismiss insofar as the assault complaint was based only on A.M.'s contradictory testimony. Defendant requests that we release him subject to conditions of release or dismiss the charges against him.

¶ 10. Under 13 V.S.A. § 7553, a person charged with an offense punishable by life in prison may be held without bail if "the evidence of guilt is great." This statute supplements Chapter II, § 40(1) of the Vermont Constitution, which authorizes the court to hold a person without bail under these circumstances. We have explained that "in cases where the constitutional right [to bail] does not apply, the presumption is switched so that the norm is incarceration and not release." *State v. Blackmer*, 160 Vt. 451, 458, 631 A.2d 1134, 1139 (1993). Consequently, so long as the trial court gives a defendant an opportunity to be heard, "the trial court's discretion is extremely broad." *Id.* In determining whether the evidence of guilt is great, we consider whether substantial, admissible evidence of guilt, taken in the light most favorable to the State, can fairly and reasonably convince a fact-finder beyond

a reasonable doubt that defendant is guilty. *State v. Duff*, 151 Vt. 433, 440, 563 A.2d 258, 263 (1989). This is the standard articulated in Vermont Rule of Criminal Procedure 12(d). *State v. Madison*, 163 Vt. 390, 393, 659 A.2d 124, 126 (1995).

¶ 11. Defendant argues that the court wrongly interjected evidence about Battered Women's Syndrome into the weight-of-evidence hearing and improperly relied on that testimony in determining that the evidence of guilt was great. The short answer to this argument is that the court's action in this regard is irrelevant to our decision. Because the standard for assessing the weight of the evidence is an objective one, *this Court* must determine whether substantial, admissible evidence of guilt, taken in the light most favorable to the State, can reasonably and fairly convince a fact-finder beyond a reasonable doubt that the defendant is guilty. See, e.g., *State v. Dixon*, 169 Vt. 15, 17, 725 A.2d 920, 921 (1999) (explaining that this Court independently applies the standard set out in Rule 12(d)); *State v. Parker*, 170 Vt. 571, 572, 744 A.2d 434, 435 (1999) (mem.) (same). The question is not how the trial court reached a particular decision about the weight of the evidence but instead whether admissible, substantial evidence objectively supports a finding of guilt beyond a reasonable doubt.

¶ 12. In our view, the record supports the court's decision that defendant should be held without bail. A.M.'s first version of events — as evidenced by both her recorded statement and the testimony of Detective Carignan — accurately matched the state of the crime scene. A.M. had red discoloration on her throat. Her voice was hoarse, and her eyes were red, which Detective Carignan testified had been, in his experience, a sign of strangulation. Moreover, A.M.'s testimony at the weight-of-evidence hearing did not convincingly undermine her earlier account. While on the stand, A.M.

gave contradictory testimony as to whether defendant had been the aggressor and as to the cause of her injuries. At other times, she claimed not to remember crucial facts. If we take the evidence in the light most favorable to the State, we find that there was sufficient, substantial, admissible evidence to convince a factfinder beyond a reasonable doubt that defendant was guilty. As a result, defendant has no right to bail.

¶ 13. While our decision that defendant has no right to bail would answer his appeal of the court's denial of his V.R.Cr.P. 12(d) motion, we cannot address this aspect of the court's decision in any case. Our jurisdiction is provided by 13 V.S.A. § 7556 and authorizes only the review of the court's determination to hold defendant without bail.

*Affirmed.*