**ENTRY ORDER**

2024 VT 69

SUPREME COURT CASE NO. 24-AP-263

OCTOBER TERM, 2024

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| | } | |
| v. | } | Superior Court, Windham Unit, |
| | } | Criminal Division |
| | } | |
| Randy Jacobs, Jr. | } | CASE NO. 24-CR-09152 |
| | } | |
| | | Trial Judge: Katherine A. Hayes |

In the above-entitled cause, the Clerk will enter:

¶ 1.    Defendant appeals the trial court's decision to hold him without bail. He argues that the trial court erred in concluding that the evidence of guilt of kidnapping was great. In the alternative, he argues that the trial court abused its discretion by declining to nonetheless release him. We affirm.

¶ 2.    A five-count information charged defendant with one count of kidnapping, one count of aggravated domestic assault, and three counts of domestic assault.[1] For the kidnapping charge, the information alleged that defendant knowingly restrained another person with the intent to inflict bodily injury upon the restrained person or place the restrained person in fear that any person will be subjected to bodily injury. That charge carries a maximum sentence of life imprisonment. 13 V.S.A. § 2405(b). The State moved to hold defendant without bail pursuant to 13 V.S.A. § 7553, which allows a person to be held without bail if the offense is "punishable by life imprisonment" and "the evidence of guilt is great."

¶ 3.    The trial court then held a weight-of-the-evidence hearing and applied a § 7553 analysis: "The evidence of guilt is great if substantial, admissible evidence, taken in the light most favorable to the State and excluding modifying evidence, can fairly and reasonably show defendant guilty beyond a reasonable doubt." State v. Blow, 2020 VT 106, ¶ 3, 213 Vt. 651, 251 A.3d 517 (mem.) (quotation omitted). If the State meets this initial burden, a presumption against release arises, and "the burden shifts to the defendant to persuade the court to exercise its discretion to set bail or conditions of release." State v. Auclair, 2020 VT 26, ¶ 16, 211 Vt. 651, 229 A.3d 1019 (mem.). The court must exercise its discretion in determining whether to impose bail or conditions

---

[1] Respectively, the charges alleged violations of 13 V.S.A. §§ 2405(a)(1)(C), 1043(a)(1), and 1042.

of release and in doing so may consider the factors in 13 V.S.A. § 7554(b). Id. ¶ 3. These factors include:

> [T]he nature and circumstances of the offense charged; the weight of the evidence against the accused; the accused's family ties, employment, character and mental condition, length of residence in the community, record of convictions, and record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings.

13 V.S.A. § 7554(b)(2). The court may also consider "[r]ecent history of actual violence or threats of violence . . . as bearing on the character and mental condition of the accused." Id.

¶ 4. The State introduced the following evidence at the weight-of-the-evidence hearing. The charges stemmed from an incident between defendant and complainant, his then-girlfriend. On August 29, 2024, defendant had been "agitated all day, wanting to fight" and arrived at complainant's house at 7:00 p.m. After eating dinner together, defendant got upset when complainant "abused" his dog by giving it less leftover bacon than complainant's dog. Complainant stated that this was when the night became "tortuous." She described being followed and cornered by defendant in each room she went into and not being let out of the bedroom. Complainant attempted to leave the house twice and told defendant that she wanted to leave but "every time I tr[ied] to leave, he [threw] me away from the door, slam[med] the door." When complainant asked "why are you still here? What are we still doing?" defendant replied, "because I'm not fucking done with you" and "you'll know when I'm fucking done." Complainant estimated that hours elapsed between her attempts to leave and said she was "basically held prisoner in my home for hours on end." She stated that she was only able to "bolt" out the back door at 3:00 a.m.

¶ 5. Complainant described multiple acts of violence throughout the night. She described that defendant "kept me—he wouldn't let me leave and he just kept grabbing the back of my head, holding me down with his knee on my neck . . . spitting on me, trying to burn me with cigarettes." She described that defendant pulled her hair which "fe[lt] like he [was] ripping my scalp off my head." At one point, when defendant had backed complainant against the sink in the kitchen, complainant described that she grabbed a knife to get him away from her. Defendant then grabbed her by the arm and told her, "I will fucking kill you if you don't put that knife back." Complainant stated that when she put the knife down, defendant threw her to the ground, pressed his knee into her throat for minutes, held his fist over her, and yelled "I'll kill you, you fucking cunt" and "if you were a fucking man, I would fucking kill you right now." At one point during the evening, defendant was attempting to burn complainant with a cigarette and complainant was attempting to hold him away when the cigarette dropped to the ground. Complainant yelled "it's burning" and defendant responded, "I hope we fucking burn." Complainant also recounted that after her second attempt to leave, defendant grabbed her, threw her down, and poured his dirty bong water on her. Complainant described it as "hours of nonstop, slow burn torture."

¶ 6. Complainant stated that she went to take a shower after defendant poured the bong water on her. Coming out of the shower, complainant observed that defendant was not in the kitchen and instead, was down the hallway by the guest bedroom. She took the opportunity to

escape through the kitchen and mudroom, run through her yard, and lie down to hide in the brush under the power lines near her house. Complainant saw a spotlight and heard defendant yelling her name and "come out, come out, wherever you are." After seeing defendant use the spotlight, she crawled further into the power line area. Complainant described that it was the scariest thing she had ever experienced, and she felt like she "was being hunted."

¶ 7. The State presented evidence that defendant had previously been abusive and physically controlling in his relationship with complainant and other women in his life. Complainant recounted that defendant often grabbed her by the jaw or her hair, had headbutted her in the forehead, and had thrown her across a wrought iron table. She also stated that this was not the first time that defendant had prevented her from leaving her house while also assaulting her. Defendant's former partner, and the mother of his child, testified that defendant had been physically abusive towards her more than once a month, describing that "he would back you into something and corner you and then grab you, typically by the face . . . . There were many, many times I had bruises along cheekbones and along the bottom of my jaw and on my neck." She also stated that defendant had engaged in "controlling" behavior describing that "I wasn't allowed really to leave the house without his permission." Defendant's former partner also stated that she had "personally witnessed [defendant] not abid[ing] by court orders" and was concerned that he would not do so in this case either. Complainant's adult daughter also testified that defendant "would become violent if we—both of us, my mother and I—did not do exactly as he wanted" and that defendant would "get in my face as well as my mother's face . . . screaming very, very loud [and] grab her by the arms if she wasn't looking at him." The daughter also stated that defendant had "spit in my face before" and that if defendant was released, she "would be scared for my safety, as well as my mother's," and defendant's former partner who testified.

¶ 8. The court heard testimony from an individual who stated that he would be willing to allow defendant to move his camper onto the individual's property and would help defendant by picking up groceries and other basics if a curfew was imposed. Defendant also presented testimony that multiple members of defendant's family live in Vermont and just across the New Hampshire border. The court also reviewed defendant's criminal record which included a conviction for a violation of an abuse-prevention order in 2012, three simple assaults in 1997, 2007, and 2008, and a probation violation in 1999.

¶ 9. Based on this evidence, the court concluded that the State had met its burden of demonstrating that the evidence of guilt was great. The court concluded that there was sufficient evidence "to establish that . . . [complainant] was indeed unlawfully restrained, and that she was in reasonable fear that she would be subject to more than bodily injury . . . . And the purpose of the restraint was to . . . continually torture and torment her." The court declined to release defendant because it found that several factors weighed against a discretionary grant of release. The court first considered defendant's criminal record including convictions for one felony and multiple misdemeanors, no violations of probation or parole, and some violations of court orders.[2] The court noted that defendant had shown that he would have a place to park his camper to stay and an individual willing to help defendant if a curfew was imposed. However, the court also

---

[2] The record indicates that defendant has one violation of probation on his record. The inconsistency between the record and the court's findings on this issue does not change the outcome in this case.

considered defendant's history and "pattern of rage and anger and of acting out in violent, threatening, and coercive ways towards women in his life" and stated it was "completely unpersuaded that releasing [defendant] at this point would be safe" and that "the evidence establishes that [defendant] loses self-control completely and . . . could not comply" with an order that would require him to stay away from the complainant and the other women who testified at the hearing. Therefore, the court granted the State's motion to hold defendant without bail.

¶ 10. On appeal, defendant argues that the State failed to present a prima facie case of kidnapping, and therefore did not meet its burden under § 7553 to demonstrate that the evidence of guilt is great. See State v. Crawford 2018 VT 119, ¶ 6, 208 Vt. 662, 200 A.3d 1086 (mem.) (describing that to demonstrate evidence of guilt is great and hold defendant without bail, State must provide "evidence sufficient to make out a prima facie case against the defendant"). Defendant further argues that the court abused its discretion by not releasing defendant.

¶ 11. We first address defendant's argument that the State failed to present a prima facie case for kidnapping. To establish a prima facie case for kidnapping the State must establish "substantial, admissible evidence that is legally sufficient to sustain a verdict of guilty on each element of the crime charged." State v. Hugerth, 2018 VT 89, ¶ 6, 208 Vt. 657, 194 A.3d 1189 (mem.) (quotation omitted). A person commits the crime of kidnapping if the person "knowingly restrains another person with the intent to . . . inflict bodily injury upon the restrained person or place the restrained person . . .in fear that any person will be subjected to bodily injury." 13 V.S.A. § 2405(a)(l)(C). In State v. Alexander, we explained that "kidnapping is a double intent crime." 173 Vt. 376, 384, 795 A.2d 1248, 1255 (2002). Specifically, the State "must prove that defendant both knowingly restrained the victim and intended to inflict bodily injury . . . to prove . . . kidnapping." Id.

¶ 12. Defendant concedes that there is sufficient evidence for a jury to find unlawful restraint but argues that "[t]here is no evidence that [defendant] was committing this unlawful restraint for the purpose of committing an assault." Instead, defendant argues that because the alleged assaults happened "after the restraint had been underway for a significant time-period . . . there is no way to infer that the intent of the original restraint was to injure [complainant] or make her scared of serious injury."

¶ 13. This Court reviews § 7553 decisions based on the record below, State v. Ford, 2015 VT 127, ¶ 8, 200 Vt. 650, 130 A.3d 862 (mem.), but "independently determines whether the standard has been met." State v. Orost, 2017 VT 110, ¶ 5, 206 Vt. 657, 179 A.3d 763 (mem.).

¶ 14. In Alexander, we described that the element of intent "is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence." 173 Vt. at 386, 795 A.2d at 1256 (quotation omitted). Furthermore, a "jury [is] entitled to infer both the intent to restrain and the intent to do serious bodily injury from the same facts." Id. at 385, 795 A.2d at 1255. When a defendant uses more force than necessary simply to effectuate the restraint, a jury can reasonably conclude that a kidnapping was for the specific purpose of inflicting bodily injury or fear of injury. Id. at 386, 795 A.2d at 1256.

¶ 15. Defendant argues that because the evidence indicates that the assaults occurred only "when [complainant] attempted to leave or fight [defendant]," a jury could not reasonably infer

4

that the unlawful restraint was for the purpose of committing an assault. There was sufficient evidence for a jury to infer defendant restrained complainant to assault her. Complainant described that, in addition to "cornering her" in multiple rooms, defendant also grabbed complainant by her hair to the point that she "fe[lt] like he [was] ripping my scalp off my head," spit on her, attempted to burn her with a cigarette, threw her to the ground, pressed his knee into her throat for multiple minutes, and poured his dirty bong water on her. A jury could reasonably conclude that the described assaults involved more force than necessary to effectuate the restraint or were unconnected to maintaining the restraint and, therefore, that the defendant restrained complainant for the purpose of assaulting her. See Alexander, 173 Vt. at 386, 795 A.2d at 1256.

¶ 16.    In addition, a jury could reasonably conclude that defendant restrained complainant for the purpose of assaulting her based on the statements he allegedly made during the evening. Complainant described that defendant grabbed her by the arm and told her, "If you don't put the knife down, I will kill you" and when complainant complied, defendant threw her to the ground, pressed his knee into her throat, held his fist over her, and yelled "I'll kill you, you fucking cunt" and "if you were a fucking man, I would fucking kill you right now." While these statements were made after complainant brandished a knife against defendant, they were also made after complainant had dropped the knife. In addition, when complainant asked "why are you still here? What are we still doing?" defendant replied, "because I'm not fucking done with you" and "you'll know when I'm fucking done." A jury could reasonably infer an intent to restrain for the purpose of inflicting injury or fear of injury from these direct statements made by defendant.

¶ 17.    Defendant argues that a kidnapping can occur only if the "intent of the original restraint was to injure [complainant] or make her scared of serious injury." (Emphasis added.) Defendant accurately states that our caselaw requires us to construe the kidnapping statute narrowly. See State v. Godhue, 2003 VT 85, ¶ 21, 175 Vt. 457, 833 A.2d 861 (explaining "[i]t is appropriate to narrowly construe a statute that carries a potential sentence of life imprisonment"). However, the plain language of the statute contains no such restriction. State v. Rougeau, 2019 VT 18, ¶ 18, 209 Vt. 535, 209 A.3d 599 (explaining "[w]e interpret statutes according to their plain language"). Section 2405(a)(1) states that the intent must exist "with" the restraint and makes no indication that the intent it must be "at the beginning of" the restraint.

¶ 18.    In this case, a jury could reasonably conclude that defendant's intent to restrain complainant occurred simultaneously with defendant's intent to inflict injury or fear of injury on complainant. The facts indicate that the restraint began shortly after 7:00 p.m. and ended around 3:00 a.m. As stated above, during that near eight-hour period, defendant grabbed complainant violently by her hair, spit on her, attempted to burn her with a cigarette, threw her to the ground, pressed his knee into her throat for multiple minutes while threatening her, and poured his dirty bong water on her. The substantial overlap between the extended restraint and the multiple assaults provides enough evidence for a jury to reasonably conclude that defendant both intended to restrain complainant and that at some point during or before that restraint, formed the intent to restrain complainant to inflict bodily injury on her.

¶ 19.    We conclude that, looking at the evidence in the light most favorable to the State, the State has presented a prima facie case for kidnapping that includes both the intent to restrain and the intent to restrain for the purpose of committing an assault or placing the complainant in fear of an assault. Therefore, because the statutory requirements in 13 V.S.A. § 7553 were met,

5

the trial court appropriately shifted the burden "to the defendant to persuade the court to exercise its discretion to set bail or conditions of release." Auclair, 2020 VT 26, ¶ 16.

¶ 20. We now turn to defendant's second argument that the trial court abused its discretion in failing to release defendant. Defendant argues that the trial court should have released defendant "on a strict curfew because he is neither a flight risk nor a risk to public safety" and because "the trial court distorted the record and did not seriously consider [defendant's] evidence or arguments."

¶ 21. We review the trial court's denial of discretionary bail in this circumstance for an abuse of discretion. Ford, 2015 VT 127, ¶ 8. "In exercising its discretion to release a defendant, the trial court may look to the factors listed in § 7554." Id. ¶ 10. The court's "discretion is broad, but the bail decision cannot be arbitrary." Id.

¶ 22. The court acted well within its discretion here in declining to release defendant under conditions. The court weighed the nature and circumstances of the offenses charged, recounting the events on August 29 and 30. The court considered the danger posed by defendant to the women who testified and the testimony concerning defendant's character and mental condition as described in the testimony of the three women who had lived with him. The court further weighed the evidence of defendant's prior convictions, the most recent of which was in 2012. The court recognized that defendant had an offer from a neighbor for a place to stay but determined that this did not outweigh the other considerations.

¶ 23. Defendant argues that the court abused its discretion because defendant "is neither a flight risk nor a risk to public safety." However, defendant supports this argument by merely reciting the evidence presented to and considered by the court at the weight-of-the-evidence hearing. The record indicates that the court heard and addressed whether defendant was a flight risk by considering testimony about the location of defendant's family and that defendant had an appropriate location to stay. The court weighed this along with other factors that did not favor release. The court determined that defendant was a risk to public safety by looking at his criminal record and the testimony of the three women who knew and had lived with defendant and concluding that it was "completely unpersuaded that releasing [defendant] at this point would be safe" and that it was "completely unpersuaded that he would be able . . . to stay away from [complainant] and the other women who testified."

¶ 24. Defendant also argues that the court did not fully provide defendant with an opportunity to be heard. Defendant supports this argument by contrasting the substantial time given to the State with the court directing the defendant to "move on" because "time [was] very short" when defendant "attempted to elicit additional details about the livability of the motorhome." However, defendant fails to demonstrate what additional evidence he would have offered and how that would have altered the court's decision. When asking the defendant to "move on," the court stated that defendant had "already" established that the motorhome was livable and later stated that it was "completely persuaded that [this wasn't a haphazard motor home because] it's obviously a very comfortable looking residence." See State v. Hardy, 2008 VT 119, ¶ 10, 184 Vt. 618, 965 A.2d 478 (mem.) (explaining that "so long as the trial court gives a defendant an opportunity to be heard, the trial court's discretion is extremely broad" (quotation omitted)).

6

¶ 25. Defendant presents conclusory statements that the court abused its discretion because the court "distorted the record and failed to account for the fact that there was no physical evidence to corroborate the claims" made in the video interview of claimant which afforded defendant no opportunity for cross examination. Defendant specifically points to the court's statement that the unlawful restraint occurred for "twenty-four hours . . . perhaps less than that, maybe twelve hours" when the evidence indicates that the restraint lasted less than eight hours. However, defendant concedes that "this is certainly a substantial period" and presents no argument or authority on why considering a twelve- or twenty-four-hour restraint as opposed to an eight-hour restraint indicates arbitrariness or an abuse of discretion. Similarly, defendant does not present what the defense would have elicited during cross examination that would have indicated arbitrariness or abuse of discretion on the part of the court. See State v. Blow, 2015 VT 143, ¶ 12 n.1, 201 Vt. 633, 135 A.3d 672 (mem.) (describing presumption in favor of incarceration subsequently "shifts the burden to the defendant to show that he is bailable")

¶ 26. We conclude that the record supports the court's conclusion that the State met its burden under 13 V.S.A. § 7553 to demonstrate that the evidence of guilt is great by providing substantial, admissible evidence that, taken in the light most favorable to the State and excluding modifying evidence, could reasonably show defendant guilty of kidnapping beyond a reasonable doubt. Blow, 2020 VT 106, ¶ 3. Furthermore, the trial court did not abuse its discretion in deciding not to release defendant.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice

7